UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

BARRY CAMPO                                          CIVIL ACTION

VERSUS                                               NO. 17-4880

NANCY A. BERRYHILL, ACTING                           SECTION "H" (2)
COMMISSIONER OF SOCIAL SECURITY

## FINDINGS AND RECOMMENDATION

Plaintiff, Barry Campo, seeks judicial review pursuant to Section 405(g) of the

Social Security Act (the "Act") of the final decision of the Commissioner of the Social

Security Administration ("Commissioner"), denying plaintiff's claim for supplemental

security income benefits ("SSI") under Title XVI of the Act. 42 U.S.C. § 1382c. This

matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)

and Local Rule 73.2(B).

I.    PROCEDURAL HISTORY

Campo filed his application on September 29, 2014, alleging disability since

July 1, 2014, due to major neurocognitive disorder, major depressive disorder and knee

problems. (Tr. 14, 87, 94, 152, 173). After his claim was denied at the agency level, he

requested a hearing before an Administrative Law Judge (ALJ), which was held on

December 15, 2015. (Tr. 29-86). The ALJ issued a decision denying the applications

on February 29, 2016. (Tr. 14-25). After the Appeals Council denied review on

March 13, 2017, the ALJ's decision became the Commissioner's final decision for purposes of this court's review.  (Tr. 1-6).

Plaintiff filed a timely memorandum in support of his appeal.  Record Doc. No. 12.  Defendant filed a timely reply memorandum.  Record Doc. No. 17.

II.    STATEMENT OF ISSUES ON APPEAL

Plaintiff contends that the Commissioner made the following errors:

A.    The ALJ erred by failing to find that Campo's substance use disorder meets the Listing of Impairments 12.09 and 12.02.

B.    The ALJ mischaracterized evidence from two examining physicians, which caused the ALJ's residual functional capacity evaluation to be unsupported by substantial evidence.

C.    The ALJ failed to resolve an apparent conflict between the testimony of the vocational expert and the requirements of the Dictionary of Occupational Titles ("DOT"), which caused the ALJ's reliance on the vocational expert's testimony at step five of the sequential evaluation process not to be supported by substantial evidence.

III.    ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

1.    Plaintiff has not engaged in substantial gainful activity since September 29, 2014, the date of his application.

2.    He has severe impairments consisting of substance addiction and affective disorder.

3.    Campo does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically including Listings 12.04 for affective disorder and 12.09 for substance addiction disorders. With respect to plaintiff's substance addiction disorder, the ALJ considered

2

the other listings under Listing 12.09 and found that the medical evidence does not support a finding that any of those listings is satisfied.

4.  Plaintiff has the residual functional capacity to perform medium work and is able to perform simple tasks.

5.  His medically determinable impairments could reasonably be expected to cause some of the alleged symptoms. However, his statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

6.  Campo cannot perform his past relevant work as a pipefitter.

7.  Considering plaintiff's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers that he can perform, such as kitchen helper, cook helper and detailer. The vocational expert's testimony is consistent with the information contained in the DOT.

8.  Campo has not been under a disability since September 29, 2014.

(Tr. 16-25).

IV.  <u>ANALYSIS</u>

A.  <u>Standards of Review</u>

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. <u>Richard ex rel. Z.N.F. v. Astrue</u>, 480 F. App'x 773, 776 (5th Cir. 2012) (citing <u>Perez v. Barnhart</u>, 415 F.3d 457, 461 (5th Cir. 2005)); <u>Stringer v. Astrue</u>, 465 F. App'x 361, 363 (5th Cir. 2012) (citing <u>Waters v.</u>

3

Barnhart, 276 F.3d 716, 716 (5th Cir. 2002)).  Substantial evidence is more than a

scintilla but less than a preponderance and is such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389,

401 (1971); Richard ex rel. Z.N.F., 480 F. App'x at 776; Stringer, 465 F. App'x at

363-64; Perez, 415 F.3d at 461.  This court may not reweigh the evidence in the record,

try the issues de novo or substitute its judgment for the Commissioner's, even if the

evidence weighs against the Commissioner's decision.  Halterman ex rel. Halterman v.

Colvin, 544 F. App'x 358, 360 (5th Cir. 2013) (citing Newton v. Apfel, 209 F.3d 448,

452 (5th Cir. 2000)); Stringer, 465 F. App'x at 364.  The Commissioner, rather than the

courts, must resolve conflicts in the evidence.  McCaskill v. Dep't of Health & Human

Servs., 640 F. App'x 331, 332-33 (5th Cir. 2016) (citing Perez, 415 F.3d at 461); Luckey

v. Astrue, 458 F. App'x 322, 324 (5th Cir. 2011) (citing Selders v. Sullivan, 914 F.2d

614, 617 (5th Cir. 1990)); Newton, 209 F.3d at 452.

The ALJ is entitled to make any finding that is supported by substantial evidence,

regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma,

503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record

in its entirety to determine the reasonableness of the decision reached and whether

substantial evidence supports it.  Joubert v. Astrue, 287 F. App'x 380, 382 (5th Cir.

2008) (citing Perez, 415 F.3d at 461).  Any findings of fact by the Commissioner that are

supported by substantial evidence are conclusive.  Ray v. Barnhart, 163 F. App'x 308, 311 (5th Cir. 2006) (citing Perales, 402 U.S. at 390); Perez, 415 F.3d at 461.

To be considered disabled and eligible for SSI, plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2015).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.[1]  Id. §§ 404.1520, 416.920;

---

[1]The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to a claimant's vocational factors and

Alexander v. Astrue, 412 F. App'x 719, 720 (5th Cir. 2011) (citing Audler v. Astrue, 501 F.3d 446, 447 (5th Cir. 2007)); Perez, 415 F.3d at 461. The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled. Id.

The claimant has the burden of proof under the first four parts of the inquiry. If he successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy that the claimant is capable of performing. When the Commissioner shows that the claimant is capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding. Alexander, 412 F. App'x 720-21; Perez, 415 F.3d at 461.

The court weighs four elements of proof when determining whether there is substantial evidence of disability: "'(1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history.'" Chrisner v. Astrue, 249 F. App'x 354, 356 (5th Cir. 2007) (quoting Wren v. Sullivan, 925 F.2d 123, 126 (5th Cir. 1991)); accord Perez, 415 F.3d at 463.

---

residual functional capacity coincide, the rules direct a determination of disabled or not disabled. Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

B.     Factual Background

1.     Plaintiff's testimony

Campo testified at the hearing that he was 55 years old and had graduated from high school.  He said he lost his driver's license several years ago and never applied for a new one.  (Tr. 34-35).  He stated that he lives alone in a house that was owned by his now deceased parents in Raceland, Louisiana, which has no water or electric utility services.  (Tr. 35-36).  He testified that his neighbors allow him to fill a five-gallon jug with water from their house and that he washes out of a bucket.

Plaintiff said he previously lived at a shelter or rehabilitation facility operated by the Job Company in Baton Rouge.  (Tr. 36).  He testified that he could not stay there because he started drinking again out of frustration because he cannot remember things. He stated that he had always turned to alcohol "and anything else I could put my hands on" when he had problems in his life.

Campo could not remember when he worked last, but thought his last job was digging ditches for a company that was laying pipe.  He did not remember most of the names of the employers that the ALJ read aloud from his work records.  (Tr. 37-38). Plaintiff recalled working for Gulf Island as a journeyman pipefitter making "top pay." (Tr. 38).  He testified that he stopped working for Gulf Island because he "was moving too slow, couldn't think quick enough" and "could never get the hang of" the computer drawings that had replaced draftsman's drawings.  (Tr. 38-39).  He recalled working for

API Control System Solutions in 2009, trying to learn how to bend stainless steel tubing, but said he "just couldn't get it," became frustrated and "started drinking a lot and things like that." (Tr. 39).

Plaintiff did not remember any other particular jobs, only that he had worked as a laborer. He said that his "old injuries" required him to take lots of breaks, which employers did not like. He said he injured his knee playing football in high school and that it was rebuilt. He testified that he fractured a hip as a passenger in a car accident but declined to have a hip replacement because he had "heard too many horror stories about hip replacement." He stated that he "fell down . . . very drunk one night and messed my shoulder up" and that his shoulder sometimes "wants to pop out." (Tr. 40). He said he is not seeing a doctor for these problems because he does not have the funds or transportation to get to a charity hospital and that he always "toughed it out and played hurt." (Tr. 40-41).

Campo testified that he no longer drinks heavily since he almost died from alcohol poisoning a couple of years earlier. He stated that he has prescription for pain medicine and that, when he runs out of it, alcohol is cheap, legal and easy to get. He could not remember who prescribed the medication. (Tr. 41). When the ALJ pointed out that plaintiff's medical records reflect that he has been drinking heavily this year, Campo said he could not remember when he last drank. He agreed that he had seen a doctor since he

was told that he had hydrocephalus and needed a stent in his brain, but could not recall the date or what he was told at the most recent visit.

Plaintiff stated that he spends his time doing yard work at his house. He said he has a food stamp card; eats out of cans because he has no electricity, gas or water; and gets water, but nothing else, from neighbors. (Tr. 42-43). He testified that he walks to the grocery store about a mile away to buy food. (Tr. 43, 45). He said he would not trust himself to ride a bicycle because he forgets what he is doing. (Tr. 43).

Campo testified that he has no living family members in Louisiana and never had any children. He stated that he has a few friends and he goes to their house once in a while, but they mostly come to his house because they have transportation and he does not. He said they just talk for a while when they come, and sometimes he helps them with a building project, such as when they need an extra set of hands to hold a tape or the end of a board. (Tr. 44-45).

Plaintiff stated that he can lift 50 to 60 pounds. He said he walks to the grocery store as infrequently as possible because "it feels like somebody's driving a nail in my knee" and in his head or eye with every step. (Tr. 45).

Upon questioning by his attorney, Campo testified that he went to Baton Rouge for rehabilitation last year because he was tired of his life and was trying to rebuild it. He stated that the Job Company helps people by giving them a place to stay for a certain length of time, enabling them to work and save money. He said he did not finish the

program because he "was self-medicating" for pain, meaning that he continued drinking. (Tr. 46-47).

Plaintiff testified that, once while he was in Baton Rouge, he got lost and called the police to help him get back to the Job Company. He stated that the police took him there, but they later returned and took him to Lafourche Parish jail because they found a charge of contempt of court against him. He said he did not return to Baton Rouge after he got out of jail, but stayed with a friend named Marie in Raceland. (Tr. 47-48). He testified that he eventually left there because he had overstayed his welcome and then moved into his parents' house. (Tr. 48).

Campo stated that he went to the hospital for a few days in July 2015 because "I was so high I thought I was dying." He said he mostly uses alcohol, but in the past he would use some type of street drug if he had money. (Tr. 48-49). He stated that he does not want to do that anymore and is going to stop drinking and getting high because "I've knocked on death's door too many times."

Plaintiff testified that he began going to a mental health clinic a long time ago because he was tired of what was happening to him. He said the clinic helps him get medication cheaper than he could at a drugstore because he has no money to pay for it. (Tr. 50-51). He recalled taking Prozac. (Tr. 51). He remembered going to Chabert and Ochsner Hospitals because he was self-medicating by drinking too much or taking too many drugs for pain and thought he was dying. He said he has headaches and knee pain,

10

which is getting worse as he gets older, but has not had treatment for his knee because he has so many other medical problems. (Tr. 52-53).

Campo stated that, in addition to his physical problems and pain, which require him to take breaks to sit down, he cannot work because he has to ask employers to write everything down for him, which makes employers angry. (Tr. 53). He testified that the Job Company sent him out on jobs as a laborer, but he could not recall any specific types of work he did. (Tr. 53-54). He stated that employers do not like to write instructions because it takes time and they did not want to deal with him unless they could just tell him orally what to do and he could understand it. He said he could not understand oral instructions. He testified that he probably could perform job duties if an employer would write instructions and tolerate him taking breaks to sit for a while. (Tr. 54-55).

Plaintiff stated that, in addition to the occasion when he got lost in Baton Rouge, he has gotten lost at home [apparently meaning in Raceland] and that it happens fairly often if he goes to an unfamiliar place alone. He said that someone gave him a ride from Raceland to the hearing in Metairie, Louisiana, and that he would not have been able to get there otherwise because his memory is gone. He said he could have taken a Greyhound bus if someone gave him a ride to the terminal. (Tr. 55).

Campo testified that other people do not buy alcohol for him. He said he always stashed money in his shirt pockets when he had money and that, the last time he drank, he found "a good chunk of money" in the pocket of a shirt in his closet. He could not

recall when that was, except that he almost drank himself to death that time.  He said he has been taking Prozac since then, which helps him not feel so depressed.  (Tr. 56).

Plaintiff stated that he infrequently had problems getting along with people on a job, if the other people had a bad attitude and did not treat him like a man.  (Tr. 56-57). He said he can tolerate criticism from a boss because it helps him learn to do things properly.  He testified that he would have trouble getting hired "around here [because] my past haunts me," meaning that he has a reputation for not showing up for the job or for showing up, but being unable to function.  (Tr. 56-57).

Campo said that, when he is not drinking, he is able to function on some days, but on other days he does not "click" and cannot remember what he is doing.  He cited an example of when he was replacing some shingles on the roof of his house, came down to take a break, sat for a long time and had to think to remember what he was doing. (Tr. 58).  He thought that the brain stent that his doctors recommended was supposed to help his memory.  He could not remember whether his doctors discussed or planned to install the stent in the future.  (Tr. 59-60).

Plaintiff recalled being told when he was drinking that he had water on the brain, but that the fluid had not increased the last time he saw a doctor, so he was not a priority. He stated that his doctor told him that the fluid might get better if he stopped drinking, had the shunt put in and took medication.  (Tr. 60-61).  He knows that his condition will

worsen if he continues drinking heavily and that his memory would improve if he stops drinking.

Campo testified that he never had a memory problem when he was working. He stated that he was always losing jobs because he liked to get drunk, but now his problem is being unable to hold a job because he cannot remember anything. (Tr. 61). He repeated that some days he "clicks" and some days he does not, and that employers in shipyards or oil fields will not tolerate days when he does not click. He said he also moves too slowly and needs "to take breaks and sit down all the time." (Tr. 62).

### 2.   Claude Weldon Hitt's testimony

Claude Weldon Hitt testified that he has known Campo since 1979. (Tr. 63). He lives in Raceland about 7 miles from plaintiff's house. He stated that he has been going to Campo's house two to three times per week to check on him since Campo returned from Baton Rouge at the beginning of 2015. He had not seen plaintiff for two years before that. Hitt testified that plaintiff talked about suicide a couple of times four years ago, before he went to Baton Rouge, so Hitt visits Campo to make sure he is all right and has food. (Tr. 64-65).

Hitt said he encouraged plaintiff to stick with Alcoholics Anonymous ("AA"), which Campo did for a couple of years by walking to Thibodaux or Lockport for AA meetings, or Hitt sometimes gave him a ride. Hitt testified that plaintiff "backslid" from AA before he went to Baton Rouge, but has been doing well since he returned. Hitt said

that Campo used to look "terrible, weight-wise.  It reminded me of the Jews in the concentration camp," but that plaintiff regained the weight he had lost.  (Tr. 65-66).

Hitt stated that he has no knowledge that Campo is still drinking.  He said plaintiff told him a couple of times four to five months ago that plaintiff had a drink, but Hitt has not seen any bottles or cans around Campo's house.  Hitt knew that Campo had "blacked out" while mowing his lawn a few weeks earlier and was having severe headaches because Hitt took Campo to the hospital and heard him tell the doctor what had happened.  (Tr. 66).  Hitt was not aware that plaintiff had ever passed out like that before or since that occasion.

Hitt said he has talked to Campo about trying to work, but he does not believe that plaintiff has the confidence to work and that plaintiff "kind of shies away from that."  He thinks Campo would have safety problems working at his trade as a pipefitter because "his balance isn't good with his headaches and stuff."  (Tr. 67).  Hitt testified that he has seen plaintiff have painful headaches, for which he needed medication, two or three times in the past month.  (Tr. 67-68).  He said Campo does not talk as much when he has a headache.

Hitt testified that Campo does not ask him to get his medications, but Hitt offers to do so.  He recalled picking up aspirin, vitamin D, Prozac and one or two other medicines for Campo.

14

Hitt stated that the outside of plaintiff's house looks good because Campo constantly works in the yard, but that plaintiff's clothes are scattered all over the inside, the kitchen is a mess and one room has a collapsed ceiling from a roof leak. (Tr. 68-69). He said the house has no water or electricity. He testified that, when he visits, he and Campo talk and that plaintiff mostly talks about the past, not the future or the present. Hitt stated that plaintiff cannot have an intelligent conversation about current events because he cannot give a reason for his opinions. He said he occasionally takes Campo to the doctor or the store, but never anywhere else. He testified that Campo comes to his house to take a shower and Hitt makes breakfast for him before taking plaintiff to his appointment. (Tr. 69). Hitt said that Campo had showered at his house the night before the hearing, that he took plaintiff home that night and then picked him up to bring him to the hearing that morning. (Tr. 70). He stated that Campo just needs the basics of daily life, consisting of utilities and food.

Hitt testified that Campo tends to forget things and that Hitt has to remind plaintiff, such as when Hitt told Campo they would go to the food stamp office the next day. He stated that Campo did not remember it and did not know why Hitt was there the next day. (Tr. 70). Hitt said that Campo starts a project in his yard, like building a flower bed, that should take about eight hours, but it takes two or three days before plaintiff gets back to working on it and finishing it. (Tr. 71).

15

Hitt stated that he is not aware that Campo has any other friends. He is concerned about plaintiff's living situation and fears that plaintiff may commit suicide because he has no one to whom he can talk. (Tr. 71).

Hitt testified that he was there when an emergency room doctor at Chabert Hospital prescribed medications for Campo about a month earlier, which was when Hitt picked up plaintiff's medicine. (Tr. 72). Hitt did not think Campo could work a full-time job because of his memory and knowledge problems. As to memory, Hitt said that Campo had locked his keys inside his house and had to break in to get the keys. Hitt believes that Campo does not have the ability to grasp the updated, computerized technology used in pipefitting. (Tr. 73). Hitt stated that, as long as he has known plaintiff, Campo has talked about how he hurt his knee playing football his senior year in high school. (Tr. 73-74). Hitt testified that Campo still complains about knee pain and sometimes has to sit down because of it. Hitt stated that plaintiff mentions his knee problem to his doctors, but that they did not treat Campo for it because he was there for treatment of his headaches.

Hitt testified that Campo was scheduled for followup for his headaches at Ochsner Hospital, but Hitt could not arrange his schedule to take Campo, so they had not gone. (Tr. 74-75). Hitt said he did not think any of plaintiff's other friends would take him to Ochsner, except possibly Evan Leboeuf, but Leboeuf works offshore and Hitt had not seen him in six or seven months. (Tr. 74-75). Hitt stated that nothing in Campo's

16

attitude or personality keeps people away, but his lack of funds keeps them away.  Hitt

opined that Campo might have trouble remembering to get up and go to work and might

have problems getting along with co-workers or bosses, because Hitt recalled that

plaintiff had problems with his bosses in the past.  (Tr. 75).

    C.    <u>Vocational Expert Testimony</u>

A vocational expert, Brienne Frey,[2] testified at the hearing.  The ALJ asked Frey

to tell her if any of Frey's testimony differed from the Dictionary of Occupational Titles

("DOT") and if so, how and why her testimony differed.  (Tr. 76).  Frey testified that

plaintiff's past work as a pipefitter was heavy labor with a Specific Vocational

Preparation ("SVP") level[3] of 7.  (Tr. 76-77).  Frey stated that Campo's jobs through the

Job Company were as a construction worker, which is heavy work with an SVP of 4; golf

---

[2]The ALJ's opinion states that a different vocational expert testified (Tr. 14), but the transcript is clear that Ms. Frey testified.  (Tr. 33).  Although the transcript identifies the expert phonetically as "Leanne Frye" (Tr. 29), her curriculum vitae provides the correct spelling of her name.  (Tr. 229).

[3]The DOT "lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  SSR 00-4P, <u>Titles II & XVI:  Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Information in Disability Decisions</u>, 2000 WL 1898704, at *3 (Dec. 4, 2000).

        An SVP 2 job typically has a learning period of "[a]nything beyond short demonstration up to and including 1 month;" an SVP 4 job typically has a learning period of "[o]ver 3 months up to and including 6 months;" an SVP 5 job typically has a learning period of "[o]ver 6 months up to and including 1 year;" and an SVP 7 job typically has a learning period of "[o]ver 2 years up to and including 4 years."

<u>Bayer v. Colvin</u>, 557 F. App'x 280, 284 n.2 (5th Cir. 2014) (quoting U.S. Dep't of Labor, <u>Dictionary of Occupational Titles</u>, App. C. II (4th ed. 1991)).

course laborer, medium with an SVP of 3; clean-up worker, heavy with an SVP of 2; and kitchen helper/dishwasher, medium with an SVP of 2. (Tr. 77-78).

The ALJ posed a hypothetical of a person with the same age, education and work experience as Campo who can lift and carry 50 pounds occasionally and 25 pounds frequently; sit for six hours in an eight-hour day; stand and/or walk for six hours in an eight-hour day; and perform simple tasks. Frey testified that such a person could not perform plaintiff's past relevant work as a pipefitter, but could perform other jobs that are available in the state and national economies. (Tr. 78). She gave examples of kitchen helper (DOT 318.687-010), cook's helper (DOT 317.687-010) and detailer (DOT 915.687-034), all of which are medium work with an SVP of 2. (Tr. 78-79). She testified that plaintiff's past work as a pipefitter includes skills transferrable to light work, including fabricating, installing and repairing structures, bolting and screwing. The vocational expert said that the only positions to which these skills would transfer are sewer maintenance supervisor and line walker. (Tr. 79).

The ALJ modified the hypothetical to incorporate the first hypothetical of a full range of medium work, limited to simple tasks only, and added that the individual would miss work occasionally, meaning up to one-third of the time. Frey testified that such a person could not perform any of the jobs she had mentioned.

Upon questioning by plaintiff's attorney, Frey testified that she understood simple tasks to mean "reasoning, math, language level of below average intelligence or not

18

requiring grade level six or greater." She stated that she did not consider "simple, routine" to mean repetitive, but "it [is] more of an educational level." (Tr. 80).

When the ALJ asked whether Frey could define "simple" in terms of the number of steps, the vocational expert said it means one- to two-step tasks. When plaintiff's attorney asked Frey to describe the steps of a kitchen helper's job, Frey testified that the job is actually that of kitchen helper/dishwasher. She said the steps are bussing tables, which means going to the table and picking up the dirty dishes, and then taking the dishes to the kitchen and putting them in the sink to be washed, or washing them. At the ALJ's request, Frey clarified that the first step is collecting the dishes and the second step is washing them. In response to a question by plaintiff's attorney, Frey testified that any job could be broken down into more steps "if you wanted to be more specific about every step you took. But that would be, basically, the main job duty of that job would be one to two steps." (Tr. 81).

Plaintiff's attorney asked the vocational expert to assume the same facts as in the ALJ's second hypothetical, except that instead of missing work occasionally, the person would miss work 20 percent of the time. (Tr. 81-82). Frey testified that such an individual would not be capable of performing a job and that the customary tolerance for unscheduled absences, such as calling in sick, would be once a month at the most. She stated that missing work without calling in or notifying the employer would not be acceptable even once.

Plaintiff's counsel posed a fourth hypothetical with the same restrictions as the ALJ's second hypothetical, except that the person must be redirected in performing tasks up to 20 percent of the time.  (Tr. 82).  Frey said that a person who is off task more than 20 percent of the time would not be able to hold a job, but being off task 10 percent of the time would probably be acceptable.  (Tr. 82-83).  In response to another hypothetical from plaintiff's attorney in which the same person would require written, rather than oral, instructions for simple tasks, Frey testified that it might be reasonable to ask an employer at the beginning of the shift to provide written instructions of what was required, but may not be reasonable to ask for additional written instructions throughout the day.  (Tr. 83).

In response to questioning from the ALJ, the vocational expert testified that the percentages of off-task time and tolerable absences are not in the DOT, but are based on Frey's vocational experience placing and monitoring people in jobs.  (Tr. 83-84).  Frey stated that she has placed and monitored individuals in the jobs of dishwasher, detailer and cook's helper.

When plaintiff's attorney asked whether Frey had ever placed and monitored people with severe memory loss problems, she said that she had.  She testified that the outcome of the placement depended on the severity of the problems and the employer's willingness to help by writing instructions.  She stated that outcomes were more successful when the employer was willing to work with the claimant.  (Tr. 84).  She

could not say how many employers in the jobs she had named would be willing to work with an individual in that way. (Tr. 85).

D.    Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence. (Tr. 17-23). I find the ALJ's summary substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

E.    Plaintiff's Appeal

1.    The ALJ did not err by finding that Campo's substance use disorder does not meet Listings 12.09 and 12.02.

The ALJ found at the third step of the sequential evaluation that Campo's severe impairments do not meet or medically equal Listing 12.04 for affective disorders or 12.09 for substance addiction disorders. With respect to plaintiff's substance addiction disorder, the ALJ stated that she "considered the claimant's condition under the other listings outlined under Listing 12.09. The medical evidence of record does not support a finding that the requirements of any of those listings are satisfied." (Tr. 17).

Campo argues that the ALJ erred by failing to discuss specifically or find that he meets Listing 12.02 for an organic mental disorder as a result of his substance addiction, which was one of the listings incorporated into Listing 12.09 at the time of the ALJ's

decision.[4]  The Commissioner responds that the ALJ's statement that she considered the other listings of Listing 12.09 necessarily includes Listing 12.02 and is presumptively valid.  If the ALJ erred by failing to discuss Listing 12.02, the Commissioner argues that the error was harmless because the medical evidence does not substantially support a finding that Campo meets the listing.

Listing 12.09 at the time of the ALJ's decision was "structured as a reference listing; that is, it will only serve to indicate which of the other listed mental or physical impairments must be used to evaluate the behavioral or physical changes resulting from regular use of addictive substances."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A) (2016), available in POMS, at https://secure.ssa.gov/poms.nsf/lnx/0434132009.  Listing 12.09 applied to "[b]ehavioral changes or physical changes associated with the regular use of substances that affect the central nervous system.  The required level of severity for these disorders is met when the requirements in any of the following (A through I) are satisfied."  Id. § 12.09.  Organic mental disorders are evaluated under the criteria of Listing 12.02.  Id. § 12.09(A).

The Fifth Circuit has previously rejected Campo's argument that an ALJ must always explain in detail her reasons for finding that a claimant does not meet a listing.

---

[4]The listings of mental disorders have been revised recently.  Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138 (Sept. 26, 2016) (effective Jan. 17, 2017).  The listings in effect at the time of the ALJ's decision can be found at the Social Security Administration's Program Operations Manual System ("POMS"), DI 34132.009, https://secure.ssa.gov/poms.nsf/lnx/0434132009 (last visited Nov. 29, 2017).

> [Plaintiff] asserts that the ALJ erred at step three of the five-step process by failing to explain why her impairment did not meet [a certain] listing . . . . [Plaintiff] cites no binding authority for the contention that the ALJ is required to articulate the reasons supporting his finding under step three. Thus, the <u>sole question before this court is whether substantial evidence supports the ALJ's finding that [plaintiff] did not have an impairment under Appendix 1</u> of the regulations.

<u>Bullock v. Astrue</u>, 277 F. App'x 325, 327-28 (5th Cir. 2007) (citing <u>Selders</u>, 914 F.2d at 614) (emphasis added). Campo cites no binding authority, and my research has located none, that requires the ALJ to articulate with greater specificity her reasons for finding that Campo did not meet Listing 12.02, incorporated in Listing 12.09. Although the ALJ did not discuss Listing 12.02, it is clear from the ALJ's opinion that she considered the entire medical record in reaching her conclusions.

Even if the ALJ erred by not addressing the listing, the error is harmless unless Campo can carry his step three burden to show that his condition meets Listing 12.02. Whether an impairment or combination of impairments meets a listing is a medical question that can be answered <u>only</u> by medical evidence. 20 C.F.R. §§ 404.1526(b), 416.926(b); <u>McCuller v. Barnhart</u>, 72 F. App'x 155, 158 (5th Cir. 2003); <u>Selders v. Sullivan</u>, 914 F.2d 614, 619 (5th Cir. 1990); <u>McKnight v. Astrue</u>, No. 07-1654, 2008 WL 4387114, at *3 (W.D. La. Aug 15, 2008), <u>report & recommendation adopted</u>, 2008 WL 5746939 (W.D. La. Sept. 23, 2008), <u>aff'd</u>, 340 F. App'x 176 (5th Cir. 2009). "The specified medical criteria [of a listing] are designed to be demanding and stringent because they lead to a presumption of disability[,] making further inquiry unnecessary."

23

Anderson v. Astrue, No. 3:11-CV-0051-K-BH, 2011 WL 3331821, at *6 (N.D. Tex. July 11, 2011), report & recommendation adopted, 2011 WL 3347857 (N.D. Tex. July 29, 2011) (citing Sullivan v. Zebley, 493 U.S. 521, 532 (1990); Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994)).

Plaintiff "must demonstrate that his impairment meets all the specified medical criteria of the listing, rather than merely some of the criteria." McCaskill v. Dep't of Health & Human Servs., 640 F. App'x 331, 334 (5th Cir. 2016). "An impairment that manifests only some of the requisite criteria, no matter how severely, does not qualify. If the plaintiff fails to demonstrate the specified medical criteria, the court will find that substantial evidence supports the ALJ's finding that listings-level impairments are not present." Gewin v. Astrue, No. 10-1008, 2011 WL 3924232, at *3 (W.D. La. Aug. 3, 2011), report & recommendation adopted, 2011 WL 3954877 (W.D. La. Sept. 6, 2011) (citing Zebley, 493 U.S. at 530-31; Selders, 914 F.2d at 620); accord Taylor v. Astrue, No. 3-10-CV-1158-O-BD, 2011 WL 4091506, at *8 (N.D. Tex. June 27, 2011), report & recommendation adopted, 2011 WL 4091503 (N.D. Tex. Sept. 14, 2011), aff'd, 706 F.3d 600 (5th Cir. 2012).

Thus, Campo must identify specific medical evidence demonstrating that he meets all the criteria of Listing 12.02. As relevant to Campo's argument, Listing 12.02 at the time of the ALJ's decision required:

Psychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied . . . .

A. Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:

. . .

2. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or

. . .

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02(A), (B) (2016), available in POMS, at https://secure.ssa.gov/poms.nsf/lnx/0434132009 (emphasis added). "Marked" "means more than moderate, but less than extreme," such that the limitation "interfere[s] seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." Id. § 12.00(C).

Campo argues that his condition satisfies paragraph A because he has a demonstrated loss of specific cognitive abilities with medically documented memory impairment. He asserts that he meets paragraph B because he has marked restriction of

25

activities of daily living and marked difficulties in maintaining concentration, persistence or pace.

At the third step of the sequential evaluation, the ALJ made specific findings regarding the paragraph B criteria of Listing 12.04 for affective disorders that correspond to the <u>identical</u> criteria of paragraph B of Listing 12.02.  The ALJ found that plaintiff has moderate restriction in his activities of daily living, mild difficulties in social functioning, moderate difficulties in maintaining concentration, persistence or pace, and has not experienced repeated episodes of decompensation. (Tr. 17-18).  (Campo does not contest the findings regarding his social functioning and episodes of decompensation.) Substantial evidence supports the ALJ's findings that plaintiff has moderate (<u>i.e.</u>, less than marked) restriction in his activities of daily living and moderate difficulties in maintaining concentration, persistence or pace.

As to his activities of daily living, as the ALJ stated, the evidence shows that Campo reported that he is unable to take care of his finances and does not drive because he did not reapply for a driver's license.  However, he regularly maintains his yard, cares for himself despite his lack of utilities, walks a mile to the grocery store, shops with a food stamp card, eats simple meals of canned goods, retrieves water from a neighbor as needed, goes to a friend's home to bathe and occasionally helps friends with building projects.  Most of the medical records noted either that plaintiff was well-groomed, well-nourished or well-developed during examinations or did not mention his appearance.

26

(Tr. 292-93, 304, 313-14). After he began psychiatric treatment in August 2015, he reported at a followup visit on December 7, 2015, that he was compliant with his medications and had a good appetite, energy and mood. (Tr. 292). The evidence is consistent with the ALJ's finding of moderate limitations in activities of daily living.

In finding that Campo has moderate difficulties with concentration, persistence and pace, the ALJ noted that plaintiff reported not being able to handle stress or changes in routine and to remember what he reads or what people tell him. The ALJ stated that the medical evidence includes mental status testing results indicating that Campo "has some cognitive impairments" in these areas. (Tr. 18). However, plaintiff's diagnoses of neurocognitive impairments are insufficient to establish listing level severity "because a mere diagnosis says nothing about the severity of the condition." Parra v. Astrue, No. 4:07-CV-443-Y, 2009 WL 49999, at *5 (N.D. Tex. Jan. 6, 2009) (citing Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988)). As the ALJ discussed at length at step four of the sequential evaluation, there are conflicts in the medical evidence, which the ALJ resolved by weighing the entire record and finding that, despite some neurocognitive decline, the medical evidence does not support a finding that plaintiff's memory and concentration problems were as severe as he asserted.

Substantial evidence therefore supports the ALJ's findings that Campo has less than marked limitations in activities of daily living and in concentration, persistence and pace. Thus, he does not meet at least two of the four paragraph B criteria of Listing

12.02 and cannot be considered disabled per se under that listing even if he meets the requirements of paragraph A.

The Commissioner also argues that Campo does not satisfy the paragraph A requirement of medically documented persistence of memory impairment because "the record suggests that Plaintiff may have manipulated his memory examinations." Defendant's memorandum, Record Doc. No. 17 at p. 6.  The ALJ made no specific finding with respect to the paragraph A requirements of Listing 12.02, but she noted in her discussion of the paragraph B criteria that the medical evidence includes mental status testing results, which she discussed at the fourth step, indicating that plaintiff has some cognitive impairments with respect to his concentration, persistence and pace.

As the ALJ acknowledged in her review of the medical evidence at step four, two examining physicians noted Campo's possible malingering or motive for secondary gain regarding his memory impairment during his hospitalization at Ochsner Hospital from July 25 to August 1, 2015.  Brian Han, M.D., a resident at the hospital whose discharge summary was approved by the attending physician (Tr. 262), noted in the report that

> [t]here maybe [sic] a malingering component to [plaintiff's] memory impairment.  Per neuropsychiatry evaluation, the patient has difficulty with free recall decline but not like in dementia. . . .  He seems to be trying to obtain social security disability as he hinted a diagnosis of dementia would be helpful for his case.  The patient was AAOx2 [awake, alert and oriented to two out of the three dimensions of person, place and time,] every day but

able to recite all the US presidents up until William Jefferson "Bill" Clinton.

(Tr. 264). Neuropsychologist Brian M. Mizuki, Psy.D., examined and tested plaintiff in the hospital on July 28, 2015, three days after Campo had been admitted "in the setting of delirium" with "very poor memory" after "drinking a half to full gallon of vodka per day prior to admission." (Tr. 271). Dr. Mizuki stated that Campo was oriented to person and time, could not recall the hospital's name, knew it was not in Baton Rouge, but "would not give a guess" where it was located. Id. Dr. Mizuki stated that plaintiff's test results

> revealed several cognitive strengths and weaknesses. Most noteworthy were his difficulties with free recall, although he doesn't demonstrate the type of frank forgetting suggestive of an amnesiac disorder . . . . Rather, his difficulties are related to problems with inattention and cognitive organization/retrieval . . . suggestive of fronto-subcortical dysfunction. . . . While his cognitive deficits do not appear to be at the level to warrant a diagnosis of dementia, he is certainly experiencing a decline in functioning, with substance dependence presumed to be the primary [but not the only] contributing factor.

(Tr. 272). Dr. Mizuki pointedly noted that Campo "is currently in the process of trying to obtain Social Security benefits. He was initially evasive with this information, as he did not give a clear answer about his intent, even when asked about it 3 different times," but eventually revealed it "and seemed to hint at the fact that a diagnosis of dementia would be helpful to his case." Id.

To contradict this evidence, plaintiff relies on the report of psychologist M. Bernard Atkinson, Ph.D., who administered a battery of psychological tests to Campo on September 22, 23 and 24, 2014, at the request of plaintiff's attorney. Dr. Atkinson stated in his report dated October 20, 2014 that one of the tests indicated that Campo was <u>not</u> malingering. (Tr. 240-54). However, Dr. Atkinson's opinion that Campo was not malingering in September 2014 does not preclude the suspicions of Drs. Mizuki and Han during plaintiff's hospitalization ten months later that Campo may have been magnifying his memory impairment to support his application for SSI benefits. As discussed below, the ALJ resolved this conflict when she afforded "great weight" to Dr. Mizuki's opinions and "some weight" to Dr. Atkinson's opinions. "'Conflicts of evidence are for the Commissioner, not the courts, to resolve. If the Commissioner's fact findings are supported by substantial evidence, they are conclusive.'" <u>McCaskill</u>, 640 F. App'x at 332-33 (quoting <u>Perez</u>, 415 F.3d at 461).

Because Campo has not met his burden to demonstrate that his organic mental disorder meets either paragraph A or B or Listing 12.02, as incorporated in Listing 12.09, the ALJ did not err in finding that plaintiff's condition did not meet the listing's strict criteria. <u>Heck v. Colvin</u>, 674 F. App'x 411, 414-15 (5th Cir. 2017) (citing <u>Zebley</u>, 493 U.S. at 530; <u>Perez</u>, 415 F.3d at 461; <u>Falco</u>, 27 F.3d at 162).

2.    The ALJ appropriately summarized and weighed the evidence from two examining physicians.

At the fourth step of the sequential evaluation, the ALJ reviewed the entire record and found that plaintiff has the residual functional capacity to perform medium work and is able to perform simple tasks. The ALJ found that Campo's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but that his statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

Campo argues that the ALJ erred in her consideration of the evidence in three respects. First, plaintiff contends that the ALJ mischaracterized the statements in the Ochsner records from Drs. Mizuki and Han quoted in the preceding section, which Campo claims do not establish that he was malingering with respect to his memory impairment, and by not discussing at length Dr. Mizuki's other findings about plaintiff's cognitive deficits. Second, plaintiff argues that the ALJ failed to discuss or afford proper weight to Dr. Atkinson's opinions that plaintiff is severely impaired in all mental areas by a major neurocognitive disorder. Campo further argues that the ALJ improperly relied on the opinion of Aroon Suansilppongse, M.D., a non-examining psychiatrist who reviewed Dr. Atkinson's report on February 22, 2015. (Tr. 90-91). Dr. Suansilppongse stated that plaintiff's "test scores were influenced by his depressive reaction during the testing" and that a large discrepancy between certain scores within the IQ test

31

administered by Dr. Atkinson "was not adequately explained," which rendered the mental status examination evidence "redundant and incomplete." (Tr. 91). Campo asserts that Dr. Atkinson's report contained nothing to support Dr. Suansilppongse's first statement and that Dr. Atkinson addressed the IQ score discrepancy in his report, which contradicts Dr. Suansilppongse's second statement. The record also includes a third-party function report dated January 16, 2015, by Rhonda Steger, the director of the Job Company, who is not a health care provider. (Tr. 195-202). Conceding that the ALJ appropriately gave little weight to Steger's lay opinions regarding Campo's ability to perform work-related functions, plaintiff argues that the ALJ failed to consider Steger's factual statements based on her personal experience in working with Campo. Plaintiff argues that the ALJ chose only the evidence that supported her findings and that these errors caused the ALJ's residual functional capacity evaluation to be unsupported by substantial evidence.

In assessing plaintiff's residual functional capacity, the ALJ afforded great weight to Dr. Mizuki's opinions from July 2015 (which are partially quoted in the preceding section of this report and recommendation) and some weight to Dr. Atkinson's opinions from October 2014. The ALJ gave little weight to Dr. Suansilppongse's opinion in February 2015 that the medical record was insufficient to substantiate any mental impairment, but she cited Dr. Suansilppongse's two statements quoted in the preceding paragraph as part of her reasoning for giving Dr. Atkinson's opinions only some weight.

Relying on Dr. Mizuki's and Dr. Suansilppongse's opinions, the ALJ found that Dr. Atkinson's opinions were partially consistent with the record as a whole and that Campo is not so severely impaired as Dr. Atkinson indicated.  (Tr. 22).

"It is the responsibility of the ALJ to interpret 'the medical evidence to determine [a claimant's] capacity for work.'" Fontenot v. Colvin, 661 F. App'x 274, 277 (5th Cir. 2016) (quoting Taylor v. Astrue, 706 F.3d 600, 603 (5th Cir. 2012)) (brackets in original).  "The ALJ 'is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly.'" Ramirez v. Colvin, 606 F. App'x 775, 779 (5th Cir. 2015) (quoting Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985)); accord Yates v. Colvin, 606 F. App'x 225, 229 (5th Cir. 2015) (citing Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir. 1994)).

> [T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion.  The treating physician's opinions are not conclusive.  The opinions may be assigned little or no weight when good cause is shown.  Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.

Newton, 209 F.3d at 455-56 (quotations and citations omitted).

As she is required to do, the ALJ in the instant case assessed the credibility of the witnesses and weighed and resolved conflicts in the medical evidence.  When the ALJ has relied on reports from examining and reviewing physicians and adequately dealt with

any dispute between them, her residual functional capacity determination "must be upheld under the substantial evidence standard, because reliance on the analysis of these doctors is more than a mere scintilla, and any evaluation of the accuracy of the analysis is beyond the scope of this court's review."  Fontenot, 661 F. App'x at 277 (citing Taylor, 706 F.3d at 603; Perez, 415 F.3d at 461; Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990)).

The ALJ's opinion demonstrates that she carefully considered all of the evidence. She afforded some weight to Dr. Atkinson's opinions and to the consistent findings by Dr. Mizuki when she found that plaintiff has some neurocognitive impairment (Tr. 22), but she rejected Dr. Atkinson's opinions that Campo has such severe limitations that he is unable to perform all work.  The ALJ explained her decision by noting that Dr. Atkinson's opinions were rendered before Campo underwent treatment that improved his symptoms and were only partially consistent with the other medical evidence.

Plaintiff disagrees with the statements of Dr. Suansilppongse, a state agency medical consultant, that Campo's test scores were influenced by his depressive reaction during the testing and that a large discrepancy between certain scores within the IQ test administered by Dr. Atkinson was not adequately explained.  "State agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation."  20 C.F.R. § 404.1527(f)(2)(i).  "Although ALJs 'are not bound by any

findings made by State agency medical or psychological consultants,' they must consider such findings as opinion evidence." Alejandro v. Barnhart, 291 F. Supp. 2d 497, 515 (S.D. Tex. 2003) (quoting 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i)); accord Butler v. Barnhart, 99 F. App'x 559, 560 (5th Cir. 2004) (citing 20 C.F.R. § 404.1527(f)(2)(i)). Dr. Suansilppongse was qualified to interpret Dr. Atkinson's report and to opine regarding the effect of plaintiff's depressive symptoms, which are documented in Dr. Atkinson's report, on the test results and to opine that Dr. Atkinson's explanation for the IQ score discrepancy was not adequate.

Campo disagrees with the ALJ's reliance on the statements (1) of Dr. Han that there may be a malingering component to plaintiff's memory impairment because he was seeking SSI benefits, which was Dr. Han's interpretation of Dr. Mizuki's earlier report, and (2) of Dr. Mizuki that plaintiff was evasive about his effort to obtain SSI benefits and hinted that a diagnosis of dementia would be helpful to his case. Aside from incorrectly attributing both statements to Dr. Mizuki, the ALJ's summary of these statements was accurate and went directly to the credibility of plaintiff's reports to the hospital doctors and testing by Dr. Mizuki. To the extent these physicians' statements conflict with Dr. Atkinson's opinion that plaintiff was not malingering during testing ten months earlier, the ALJ could justifiably find that this opinion did not carry as much weight as the opinions of Drs. Mizuki and Han formed during Campo's one-week hospitalization in July 2015.

35

The ALJ adequately explained why she gave little weight to Steger's third-party function report. The ALJ noted that Steger's statements pertained to plaintiff's condition between February and November 2014, but that his depressive condition improved with treatment in 2015 and that the level of severity which Steger reported was not adequately supported by the medical record. The ALJ accurately summarized the medical records and concluded that, despite some documented neurocognitive impairment, plaintiff's mental status examinations and objective medical imaging of his head and brain do not support the alleged level of severity.

Although this court might reach a different conclusion if it were the initial factfinder, the applicable legal standard of review requires that it cannot reweigh these conflicts in the evidence. The ALJ need not address each aspect of the record in detail. "[T]here will always be some evidence that is not specifically discussed in the Commissioner's decision. Our review is limited to examining whether the decision to deny benefits is supported by substantial evidence in the record, and it is here. Likewise, the Commissioner used the proper legal standards to evaluate the evidence, and the ALJ adequately resolved inconsistencies in the record." Giles v. Astrue, 433 F. App'x 241, 251 (5th Cir. 2011). Accordingly, this assignment of error lacks merit.

3.    There is no apparent conflict between the vocational expert's
<u>testimony and the DOT.</u>

The ALJ found that plaintiff has the residual functional capacity to perform medium work and is able to perform simple tasks. The ALJ posed a hypothetical to the vocational expert of a person with the same age, education and work experience as Campo who can perform medium work, limited to simple tasks. Frey testified that such a person could perform jobs such as kitchen helper (DOT 318.687-010), cook's helper (DOT 317.687-010) and detailer (DOT 915.687-034). Campo argues that the ALJ failed to resolve an apparent conflict between the testimony of the vocational expert and the requirements of the DOT, which caused the ALJ's reliance on the vocational expert's testimony at step five of the sequential evaluation process not to be supported by substantial evidence. Plaintiff contends that Frey's testimony that simple, routine tasks consist of one- to two-step tasks and require reasoning, math and language levels of below average intelligence or not above a sixth grade level conflicts with the DOT definitions of the jobs.

The ALJ may rely on vocational expert testimony to reach conclusions about the specific requirements of a particular occupation, including working conditions and the attributes and skills needed for the occupation. 20 C.F.R. § 404.1566(d), (e); Villalpando v. Astrue, 320 F. App'x 208, 211 (5th Cir. 2009); Weary v. Astrue, 288 F. App'x 961, 967 (5th Cir. 2008); Leggett v. Chater, 67 F.3d 558, 565 (5th Cir. 1995).

37

Unlike the recent decision cited by Campo, see Olive v. Colvin, No. 16-559"E"(1), 2017 WL 1653303, at *2 (E.D. La. Mar. 31, 2017), report & recommendation adopted, 2017 WL 1592488 (E.D. La. Apr. 28, 2017) ("The ALJ did not ask [the vocational expert] whether her testimony was consistent with the Dictionary of Occupational Titles ("DOT")."), the ALJ in the instant case specifically asked Frey to identify any conflicts between her testimony and the requirements of the DOT.  (Tr. 76).

Campo argues that the job of cook's helper, for example, in the DOT "includes" numerous "requirements" that make it "obvious that the duties of this job entail more than two steps."  Record Doc. No. 12, at p. 21.  However, ALJ did not limit plaintiff's residual functional capacity to jobs that require only one- or two-step tasks, but only limited it to "simple tasks."  The "DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings."  Social Security Ruling 00-4p, 2000 WL 1898704 at *3 (Dec. 4, 2000).  For each of the three jobs named by the vocational expert, the DOT does not state that they "include" all of the tasks listed, but says that the job may consist of "performing any combination of [the] following duties."  Cook helper,  DOT code 317.687-010, https://occupationalinfo.org/31/317687010.html; kitchen helper, DOT code  318.687-010, https://occupationalinfo.org/31/318687010.html; automobile detailer, DOT code 915.687-034, https://occupationalinfo.org/91/915687034.html (last visited Dec. 8, 2017).  As Frey testified, the job of kitchen helper/dishwasher, as an example, requires the

performance of simple, one- to two-step <u>tasks</u> as its main duties (Tr. 80-81), <u>not</u> that the job will never include more than one or two tasks.

Frey also stated that each job she named has an SVP of 2, which corresponds to unskilled work that "needs little or no judgment to do <u>simple duties</u> that can be learned on the job in a short period of time . . . and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed."  20 C.F.R. § 416.968(a) (emphasis added).

As to the reasoning and educational level needed to perform the tasks of the unskilled jobs identified by Frey, the instant case is also unlike <u>Olive,</u> in which the court found an apparent conflict between the DOT and the vocational expert's testimony, when the ALJ limited the illiterate plaintiff's residual functional capacity as unable to read or write more than his name, but the DOT listings for the jobs cited by the vocational expert required being able to read and write compound and complex sentences. <u>Olive</u>, 2017 WL 1653303, at *2.  By contrast, Campo testified that he completed the twelfth grade and could read simple written instructions from an employer, but believed that employers would not want to provide him with written instructions.  His psychological testing in September 2014 showed that he was spelling and reading at the 11th grade and 12th grade levels, respectively.  (Tr. 241).

The vocational expert testified that a person who is limited to simple tasks could perform the three jobs with an SVP of 2.  According to the DOT, the three jobs also have

a General Educational Development level of 2, which requires a worker to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions." DOT App. C, Part III, http://www.occupationalinfo.org/appendxc_1.html (last visited Dec. 8, 2017).  There is no conflict between simple work and uninvolved instructions and commonsense understanding.

"As several courts have held, reasoning level two requires the worker to apply commonsense understanding to carry out detailed but uninvolved written or oral instructions and deal with problems involving a few concrete variables in or from standardized situations, and appears consistent with a residual functional capacity to perform simple, routine work tasks."  Adams v. Astrue, No. CV07-1248, 2008 WL 2812835, at *3 (W.D. La. June 30, 2008) (citing Hackett v. Barnhart, 395 F.3d 1168, 1176 (10th Cir. 2005); Money v. Barnhart, 91 F. App'x 210, 214 (3d Cir. 2004); Busch v. Astrue, 2008 WL 2331015 (D. Neb. 2008); Miller v. Astrue, 2008 WL 759083 (S.D. W. Va. 2008); West v. Astrue, 2008 WL 2024963 (M.D. Ga. 2008); Squier v. Astrue, 2008 WL 2537129 (C.D. Cal. 2008); Riggs v. Astrue, 2008 WL 1927337 (W.D. Wash. 2008); Meissl v. Barnhart, 403 F. Supp. 2d 981, 984-85 (C.D. Cal. 2005); Flaherty v. Halter, 182 F. Supp. 2d 824, 850-51 (D. Minn. 2001)).  "Therefore, a DOT reasoning level of two is consistent with an residual functional capacity to perform simple, routine, repetitive work tasks."  Id. at *3 (citations omitted).  In the instant case, the ALJ did not

limit Campo to repetitive tasks, which would have been a more restrictive limitation. The reasoning level of two is consistent with plaintiff's residual functional capacity.

Accordingly, this assignment of error lacks merit.

CONCLUSION

The ALJ did not err by failing to find that Campo's substance use disorder meets Listing 12.02. The ALJ's summary of the medical evidence is supported by substantial evidence. There is no apparent conflict between the testimony of the vocational expert and the DOT. The ALJ's decision is supported by substantial evidence.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v.

<u>United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[5]

New Orleans, Louisiana, this ___15th___ day of December, 2017.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[5]<u>Douglass</u> referred to the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.